**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

---

**FERDOSE AL-TAIE, RECEIVER,**

**Plaintiff,**

**v.**

**SHANE TRAVELLER,**
**CLYDE CAMERON CRAVEY,**
**KENNETH WIEDRICH,**
**TAMARA TRAVELLER,**
**KIM CRAVEY,**
**ANGELA RAE WIEDRICH,**
**ROBERT SHEAR,**
**JAMES LOOKABAUGH,**
**DAVID TRAVELLER,**
**RICHARD BARBER,**
**PHILIP MCELROY,**
**JIM MCCANN,**
**JOHN COLLIER,**
**CARLO CARAVETTA,**
**WILLIAM ABT,**
**JOSHUA HUKILL,**
**MICHAEL KAMINSKI,**
**CLAUDE SHANNON CRAVEY,**
**JOHN HENRY DIESEL,**
**JOHN CAMERON CRAVEY,**
**MIC FUHRMAN,**
**JOSEPH MICHAEL SIERAKOWSKI,**
**ADRIAN GARCIA,**
**BRYON THOMAS WARNES,**
**TRENT KELLEY,**
**CHAUNCEY SAYRE,**
**SKYLAR COTTON,**
**ALEXIS CRAVEY COTTON,**
**KRISTI EVANS,**
**TIMOTHY ROBERTS,**
**MONTE FAUSET,**
**JOEL HUKILL,**
**RAY BOYKIN,**
**DEAN LOVELAND,**

**Civil Action No. ________________**

**JURY DEMAND**

**Related Case: Sec. & Exch. Comm'n. v. Reliable One Resources, Inc. et al., Case No. 6:23-cv-00006-JCB**

| | |
|---|---|
| **BRANDY FIELDS,** | ) |
| **CARY ROTHMAN,** | ) |
| **ROBIE WILLIAMS,** | ) |
| **JOHN KENNEY,** | ) |
| **JEREMY NEENAN,** | ) |
| **SHARISA WARD,** | ) |
| **HALEIGH MORGYN OWENS,** | ) |
| **HALEY CRAVEY,** | ) |
| **NANCY CRAVEY,** | ) |
| **TRAVELLER AND COMPANY, LLC,** | ) |
| **TRAVELLER CONSULTING, INC.,** | ) |
| **DESERT RIDGE, LLC,** | ) |
| **GSET MANAGEMENT** | ) |
| **CORPORATION, and** | ) |
| **OIL RIG CONSULTING, LLC** | ) |
| **Defendants.** | ) |

---

**COMPLAINT**

---

COMES NOW Ferdose al-Taie, in her capacity as receiver ("Receiver") of Reliable One Resources, Inc.; Quantum Filtration, Inc.; Reliable Enterprises, Inc., d/b/a Reliable Enterprises Ohio; Pinta Dome Joint Venture, LLC; Pinta Dome Operating, LLC; PDH Management, LLC; Yucca Valley Sand & Gravel, LLC; Geoenhanced Technologies, Inc., Helios Extraction Limited, LLC; Benwood Processing, LLC; Earth-Wise Joint Venture Endowment Fund, LLC ("EWJV"); Earth-Wise Minerals & Mining, LLC; Black Pearl Petroleum Trust, LLC, formerly known as Black Pearl Petroleum Trust; and Reliable Energy, Inc. (collectively, "Receivership Entities"), by and through undersigned counsel, and pursuant to this Court's Order Imposing Asset Freeze and Appointing Receiver in *Sec. & Exch. Comm'n. v. Reliable One Resources, Inc. et al.*, Case No. 6:23-cv-00006 (E.D. Tex. Jan. 06, 2023) ("Receivership Order"), and for her Complaint against Defendants, each of them, states and alleges as follows:

## INTRODUCTION

1. This Complaint details Defendants' long-running, ongoing, securities fraud scheme that has defrauded investors of at least $40 million. From 2015–2023, Defendants sold shares in numerous corporate entities by falsely claiming that these entities had developed industry-disrupting technologies.

2. Initially, these entities purportedly related to the oil and gas industry. Defendants touted that their flagship entity, Reliable One Resources, Inc., a South Dakota corporation ("Reliable One Resources"), would revolutionize the oil and gas industry with its water filtration technology. And they promised that GeoEnhanced Technologies, Inc., a South Dakota corporation ("GeoEnhanced Technologies") could locate previously undiscoverable oil and gas deposits through its patent-pending electro-acoustic technology. Soon, the scheme also incorporated a trucking business, a water filtration plant, and a company that chemically extracted gold from near-surface shale deposits.

3. By 2020, the scheme began to evolve. In February 2020, the Defendants registered a new South Dakota corporation, Quantum Filtration, Inc., ("Quantum Filtration") to take advantage of the emerging COVID-19 pandemic. Rather than revolutionizing the oil and gas industry, Quantum Filtration was now the only company whose face masks could "kill" the coronavirus. Likewise, Reliable One Resources was no longer a company revolutionizing water desalination; it was a "producer" of hand sanitizer. Then, in 2021, the scheme launched its Pinto Dome faction. This offshoot was still intertwined in Reliable One Resources but created numerous entities that purportedly operated in clean energy solutions, like helium mining. And by 2023, the scheme

incorporated vertical farming technology, UV light companies, and a bio-technology company that had purportedly reversed "negative aging effects" and could fight cancer.

4. None of these companies were ever operational. None of these technologies existed. In fact, after a dispute arose regarding payments among the scheme's principals, one principal reported the scheme to the SEC and ousted the Defendants' fraud on social media.

5. Through well-designed publications and intentional acts to deceive, the Defendants convinced investors that these entities were on the precipice of revolutionizing major industries. In one instance, the Defendants even marketed a demonstration for their desalination technology. However, before any demonstration could occur, upon information and belief, Defendants intentionally set the "prototype" ablaze to conceal that no technology existed. Similarly, when investors would ask to receive samples of the products in which they were investing (e.g., face masks), Defendants would repackage other companies' products as their own. And when certain investors discovered that principals were previously subject to SEC actions and lawsuits for securities fraud, the Defendants concealed those principals' continued involvement.

6. In tandem with these efforts, the Defendants employed a network of unlicensed promoters to extract over $40 million from investors. A percentage of these funds were paid to each promoter as a commission for each investment they secured—an agreement never disclosed to investors. Another percentage was plowed back into the scheme to keep it running. However, the Defendants wrongfully converted the majority of these funds for their personal uses and enjoyment. The Entities' bank records evidence

numerous instances in which Defendants either spent investor funds on luxury handbags and vacations, or more blatantly, directly transferred the funds to their personal bank accounts.

7. More notably, however, the Receivership Entities' bank records evidence that the Defendants deployed several strategies to launder investor funds. First, these records show that the Defendants frequently transferred funds between the various Receivership Entities' bank accounts. Second, between 2015-2023, the Defendants registered a still-unknown number of corporate entities in at least Texas, Ohio, West Virginia, Wyoming, Nevada, South Dakota, Utah, California, Colorado, New York, and Arizona.

8. The Defendants exclusively used these entities to open bank accounts, which the Defendants used like shells to a shell game: After investor funds hit the Receivership Entities' bank accounts, the Defendants transferred those funds to one of these shell accounts, and the game would begin. These frequent transfers eventually attracted the banks' attention. Yet, when a bank closed one account for its suspicious activity, the Defendants would simply open another account. And when the banks stopped accepting one Defendant as an authorized signatory, another Defendant stepped in. Consequently, when the Receiver gained control over the Receivership Entities' bank accounts in February 2023, only $140,000 of the investors' $40 million remained. While wrongful distributions to promoters and the Defendants account for roughly $8 million, the remaining $32 million is less easily traced.

9. In this action, the Receiver seeks to recover these missing funds, as well as statutory and punitive damages, her costs, and attorneys' fees. As alleged below, Defendants' actions constitute, at least, violations of federal and Texas securities laws, fraud, negligent misrepresentation, unjust enrichment, and conversion.

**PARTIES**

10. Plaintiff Ferdose al-Taie is the court-appointed receiver for Reliable One Resources and Quantum Filtration, among other companies, pursuant to this Court's Order Imposing Asset Freeze and Appointing Receiver in Sec. & Exch. Comm'n. v. Reliable One Resources, Inc. et al., Case No. 6:23-cv-00006 (E.D. Tex. Jan. 06, 2023). In this capacity, Receiver is authorized to litigate on behalf of the companies if necessary to preserve and recover assets for the benefit of the creditors and other interested parties. In addition to Reliable One Resources and Quantum Filtration, these companies include:

a. Reliable Enterprises, Inc., d/b/a Reliable Enterprises Ohio, a South Dakota corporation ("Reliable Enterprises, Inc."); Reliable Energy, Inc., a South Dakota corporation ("Reliable Energy, Inc.");

b. Pinta Dome Operating, LLC, an Arizona limited liability company ("PDO LLC"), PDH Management LLC, a Utah limited liability company ("PDH Management LLC"), and Pinta Dome Joint Venture, LLC, a Utah limited liability company ("Pinta Dome Joint Venture, LLC"); Yucca Valley Sand & Gravel, LLC, an Arizona limited liability company ("Yucca Valley Sand & Gravel LLC"); Helios Extraction Limited, LLC, a Wyoming limited liability company ("Helios Extraction") (collectively, with PDO LLC, PDH

Management LLC, Yucca Valley Sand & Gravel LLC, and Helios Extraction, the "Pinta Dome Entities");[1]

c. Geoenhanced Technologies, Inc., a South Dakota Corporation ("GeoEnhanced Technologies"); Demand Brands, Inc. a Washington corporation ("Demand Brands")

d. Benwood Processing, LLC, a West Virginia limited liability company ("Benwood Processing");

e. Earth-Wise Joint Venture Endowment Fund, LLC, a Utah limited liability company, ("EWJV"); Earth-Wise Minerals & Mining, LLC, a Utah limited liability company ("Earth-Wise Minerals") (collectively, with EWJV, the "Earth-Wise Entities").

f. Black Pearl Petroleum Trust, LLC, formerly known as Black Pearl Petroleum Trust, a Texas limited liability company, ("Black Pearl Petroleum"); and (collectively, with the above entities, the "Receivership Entities")

11. Defendant **Shane Traveller**, CPA, is a resident and domiciliary of the State of Texas. Formally, Shane Traveller served as Reliable One Resources, Inc.'s Chief Financial Officer from 2019–2023. In reality, Shane Traveller acted as a principal for all Receivership Entities, overseeing their operations, managing their financial records, and intimately participating in their strategic decisions. Shane Traveller is married to Defendant

[1] The Defendants additionally operated numerous variations of Pinta Dome Joint Venture that were never registered. These include "joint ventures" between: PDO LLC and PDH Management, LLC; PDO LLC and Reliable Enterprises, Inc.; PDO LLC and Ali Petroleum, LLC; and PDO LLC and Green Tree Management, LLC. For the purposes of this Complaint, these entities are included in the defined term, Pinta Dome Entities.

Tamara Wiedrich Traveller, is the son-in-law to Defendant Kenneth Wiedrich, and is the cousin of Defendant David Traveller.

12. On August 6, 2008, the United States District Court for the District of Nevada entered a final judgment against Shane Traveller for violations of federal securities law he committed between 2003 and 2005. *Sec. & Exch. Comm'n v. Compass Capital Group, Inc. et al.*, Case No. 2:08-CV-00457 (D. Nev.). In that case, Shane Traveller agreed that he participated in a scheme to: (a) evade federal registration requirements for public offerings; and (b) to defraud investors through publishing materially false and misleading information in SEC filings, financial reports, press releases, and offering statements. Compl., *Compass Capital Group, Inc.*, Case No. 2:08-CV-00457 at 2. Consequently, this judgement permanently enjoined Shane Traveller from engaging in or aiding any further violations of federal securities law,[2] required him to pay $50,000 in civil penalties, and for a period of five years, barred him from acting as an officer or director of any public company or from participating in penny stock offerings. Consent J., *Compass Capital Group, Inc.*, Case No. 2:08-CV-00457 at 2

13. Subsequently, in 2009, the Federal District Court for the Eastern District of North Carolina resolved an unrelated class action suit against Shane Traveller for additional violations of federal securities laws. *Huttenstine v. Mast et al.*, Case No. 4:05-CV-00152 (E.D.N.C. Nov. 22, 2005). There, plaintiffs again alleged numerous instances in which Shane Traveller and others published materially false and misleading statements

[2] Specifically, the order permanently enjoins Shane Traveller from violating Section 17(a) of the Securities Act, (use of interstate commerce to commit securities fraud), Sections 10(b) (fraud or deceit in connection with the sale of a security), 13(b)(5) (knowingly avoiding internal accounting controls or falsifying financial records), 13(a) (reporting requirements), and 13(b)(2)(A) of the Exchange Act, and Securities and Exchange Commission Rules 10b-5 and 13b-2, 17 C.F.R. §§ 240.10b-5, 240.13b2-1, and Rules 12b-20, 13a-1, and 13a-12, 17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-13.

in connection with the sale of securities. Compl., *Huttenstine*, Case No. 4:05-CV-00152, at 1–2. The entity at the heart of this case, HydroFlo, purportedly operated as a water treatment company that owned multiple interconnected subsidiaries. Most notably, for reasons discussed below, at least two of these subsidiaries claimed to have developed ground-breaking, patentable technology in filtration systems and the use of sound waves to determine the property of fluids. *Id*. at 3–4.

14. Then, on May 30, 2012, the SEC filed a second action against Shane Traveller for violations of federal securities law committed between 2006 and 2009. *Securities and Exchange Commission v. Lefkowitz et al.*, Case No. 8:12-cv-01210 (M.D. Fla. May 30, 2012) ("*Lefkowitz*"). The SEC alleged Shane Traveller acted as principal in a scheme that defrauded investors, intentionally evaded SEC reporting requirements, and made numerous other false or misleading material representations in the sale of securities. Compl. at 46, 50, ECF No. 1, *Lefkowitz.* Again, to resolve these claims, Shane Traveller entered into a consent agreement that barred him from violating federal securities law and required him to pay restitution and civil penalties exceeding $220,000.00.[3] Consent Jmt., ECF No. 134, *Lefkowitz*.

15. Defendant **Clyde Cameron Cravey** ("Cameron Cravey") is a resident and domiciliary of the State of Texas, and the founder of Reliable One Resources, Inc. Between 2015 to 2023, Cameron Cravey acted as a principal for all Receivership Entities, directing their strategic decisions, dictating investments and distributions of funds, and managing their operations.

---

[3] And again notably, this case dealt with an entity purportedly specializing in embryonic stem cell technology. *See infra Infinity Cell*.

16. Like Shane Traveller, Cameron Cravey has acted as the principal for multiple corporate entities that have been found liable for fraud in connection with the sale of securities or investment opportunities. For example, on September 7, 2005, the Federal District Court for the Eastern District of Texas entered a default judgment against Piney Woods Ventures, LLC, for fraud, misrepresentation, conspiracy to defraud the plaintiff investor, and misrepresentation. Jmt. *Noy v. Elgin et al.*, Case No. 2:05-cv-00190 (E.D. Tex. Sept. 7, 2005). The court ordered Cravey's company to pay $3.6 million in damages, attorneys fees, and costs. Jmt. *Noy*, Case No. 2:05-cv-00190 (E.D. Tex. Sept. 15, 2005).

17. Likewise, upon information and belief, Cameron Cravey acted as the principal of two Nevada corporations, Paradigm Oil & Gas, Inc. and Paradigm Oil Operating, Inc. (collectively "Paradigm Oil"). On January 11, 2017, the federal District Court for the Northern District of Texas entered a $2.2 million default judgment against these entities for, *inter alia*, securities fraud, violations of federal securities law, violations of Texas' deceptive trade practices act, and violations of Texas' penal code. Default Jmt., ECF No. 367 at 1, *Carrington et al v. Maye et al*, Case No. 5:16-cv-00283 (N.D. Tex. Dec 23, 2016); *see also* Fourth Amd. Compl., *Carrington v. Home Creek Energy, LLC et al*, Case No. 5:12-cv-00232 (N.D. Tex. Dec 17, 2012).

18. And most recently, Cameron Cravey acted as the principal for the Texas limited liability companies, Trinity Valley Partners, LLC, and Piney Wood Ventures, LLC. In either June 2016 or September 2019, these entities, Cameron Cravey, his wife, Defendant Kimberly Cravey, his children, and a trust created in his children's name were found liable for securities fraud and ordered to pay $7.5 million in damages and penalties. Jmt. *Chanine, et al. v. Piney Woods Ventures, LLC, et al.*, Case No. 74339-86 (Tex. Dist.

Ct. Aug. 24, 2007); *see also Kaufman County et al. v. Cameron Cravey et al.*, Case No. 92476-422 (Tex. Dist. Ct. Feb. 10, 2015);

19. Defendant **Kenneth Wiedrich** is a resident and domiciliary of the State of Louisiana. From 2015–2023, Kenneth Wiedrich served as the President of Reliable One Resources, Inc. and its subsidiary companies, and acted as a principal for all Receivership Entities. As a principal, Kenneth's primary responsibilities included generating financial reports, fielding investor questions on the entities' performance, and dictating the organizations' strategies. Kenneth Wiedrich is father-in-law to Defendant Shane Traveller and father to Defendant Tamara Traveller.

20. Like Shane Traveller and Cameron Cravey, upon information and belief, Kenneth Wiedrich has previously faced several lawsuits and adverse actions for allegedly defrauding investors. In 2014, for example, the SEC suspended trading of the company Petrotech Oil and Gas, Inc., for which Kenneth Wiedrich served as Chief Financial Officer. SEC Release No. 71723 (Mar. 14, 2014). In that action, the SEC found credible evidence that the company had publicly disseminated inaccurate and inadequate information concerning, among other things, the company's operations. *Id.*[4]

21. Similarly, in 2015, investors named Kenneth Wiedrich in a lawsuit alleging fraudulent inducement and violations of federal securities laws. *KBM Worldwide, Inc. v. Pleasant Kids, Inc. et al.*, Case No. 1:15-cv-00732 (E.D.N.Y. Feb. 12, 2015). Kenneth Wiedrich eventually settled this case.

[4] Subsequently, in 2017, the SEC charged Petrotech Oil and Gas, Inc.'s principal, Jeremy Miller, with securities fraud in violation of Section 10(b) and Rule 10-b5(b) of the Exchange Act. Notably, Jeremy Miller is still listed as "Management" for Defendants' latest entity, Infinity Cell.

22. Defendant **Tamara Traveller** is a resident and domiciliary of the State of Texas, and previously served as the managing member of Helios Extraction. Tamara Traveller is the wife of Defendant Shane Traveller and daughter to Defendant Kenneth Wiedrich. At all times relevant to this Complaint, Tamara Traveller was aware of and complicit in the scheme to defraud investors. She personally benefited from the same.

23. Defendant **Kim Cravey** is a resident and domiciliary of the State of Texas. While not directly involved in the operations of the Receivership Entities', upon information and belief, Kim Cravey was aware of and complicit in the scheme to defraud investors. She personally benefitted from the same. Along with her husband, Cameron Cravey, Kim Cravey was previously ordered to pay $7.5 million in damages and fines for her involvement in a separate scheme to defraud investors. *Chanine, et al. v. Piney Woods Ventures, LLC, et al.*, Case No. 74339-86 (Tex. Dist. Ct. Aug. 24, 2007); *see also Kaufman County et al. v. Cameron Cravey et al.*, Case No. 92476-422 (Tex. Dist. Ct. Feb. 10, 2015).

24. Defendant **Angela Rae Wiedrich** ("Angela Rae Wiedrich") is a resident and domiciliary of the State of Louisiana. Angela Rae Wiedrich was the initial person to register numerous entities on the Defendants' behalf. Upon information and belief, Angela Rae Wiedrich was aware of and complicit in the scheme to defraud investors. She personally benefitted from the same. She is the wife of Defendant Kenneth Wiedrich, and mother to Defendant Tamara Traveller.

25. Defendant **Robert "Bob" Shear** ("Bob Shear") is a resident and domiciliary of the State of Texas. Upon information and belief, from 2022–2023, Robert Shear served as the managing member of Pinta Dome Operating, LLC, the "Operator" of Pinta Dome Joint Venture, LLC, and a principal to the Receivership Entities.

26. Defendant **James Lookabaugh** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2017–2023, James Lookabaugh served as a principal of the Receivership Entities. To investors, he held himself out as the President of J&R Oilfield Specialists, the owner and President of PDH Management, LLC, the Managing Member of Yucca Minerals & Mining, LLC, and the Vice President of Field Operations for Reliable One Resources, and a manager of Ali Petroleum, LLC.

27. Defendant **David Traveller**, CPA, is a resident and domiciliary of the State of Utah. Upon information and belief, from at least 2019–2023, David Traveller served as the Receivership Entities exclusive escrow agent to whom investors wired all funds or mailed nearly every check. However, in practice, David Traveller was a principal within the Defendants' scheme to defraud investors, and through his solely owned entities, Defendants **Traveller Consulting, Inc.**, a Utah corporation, and **Traveller & Co, LLC**, a Utah limited liability company, actively facilitated its operations. For compensation, bank records from the Receivership Estate evidence distributions made to David Traveller's solely owned entities which upon information and belief were for David Traveller's benefit. David Traveller is cousin to Defendant Shane Traveller.

28. Defandant **Richard Barber** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2015–2022, Richard Barber acted as a principal of the Receivership Entities, including by serving as, among other executive roles, Chief Financial Officer and Director for the Reliable One Entities, Finance Director for the Pinta Dome Entities, and Director of Quantum Filtration.

29. Defendant **Philip McElroy** is a resident and domiciliary of the State of Colorado. Upon information and belief, from 2015–2019, Philip McElroy acted as a

principal of the Receivership Entities, including by serving as, among other executive roles, the Chief Operating Officer of the Reliable One Entities.

30. Defendant **Jim McCann** is a resident and domiciliary of the State of Florida. Upon information and belief, from at least 2015–2023, Jim McCann acted as either Reliable One Resources' "Executive Vice President of Investor Relations," or "Head of Investor Relations." In this role, Jim McCann acted as the primary principal in charge of generating investor funds for all Receivership Entities.

31. Defendant **John Collier** is a resident and domiciliary of the State of Florida. Upon information and belief, between 2015–2023, John Collier served as Reliable One Resources' "Vice President of Business Development" and named Management of the Pinta Dome Entities. In these roles, John Collier acted as a principal of the Receivership Entities and, with Jim McCann, dictated the strategy to recruit investors.

32. Defendant **Carlo Caravetta** is a resident and domiciliary of the State of Texas. Upon information and belief, from at least 2015–2019, Carlo Caravetta acted as General Counsel and a director of at least Reliable One Resources, GeoEnhanced Technologies, and Reliable Enterprises, Inc. At all times relevant to this Complaint, Carlo Caravetta's internal emails to the other Defendants indicate that he was fully aware of the ongoing securities fraud scheme. Yet, despite being a licensed attorney in the States of Texas and California and his direct involvement in the scheme, Mr. Caravetta never disclosed that fraud to investors or the SEC.

33. Defendant **William "Bill" Abt** ("Bill Abt") is a resident and domiciliary of the State of Colorado. Upon information and belief, between 2018–2023, Bill Abt acted as a principal to the Defendants' scheme and the Receivership Entities. For at least part of

this time, Bill Abt acted as the "Vice President" of Reliable One; however, upon information and belief, Bill Abt's primary duties were to sell the Receivership Entities' securities to investors. To do this, Bill Abt operated a second entity, Defendant **Oil Rig Consulting, LLC**, a Colorado limited liability company. Through Oil Rig Consulting, Bill Abt received significant distributions of investors' funds.

34. Defendant **Alan Thomas** is a resident and domiciliary of the State of Florida. Upon information and belief, Alan Thomas was a principal in the Defendants' scheme to defraud investors from its inception. From 2015–2018, Alan Thomas held himself out as a Vice President of Reliable One, though upon information and belief, his main duties were to sell the companies' securities to investors. To do this, Alan Thomas operated a second entity, Green Tree Management. Upon information and belief, Alan Thomas never registered Green Tree Management as an entity, though at different times, he held it out as both a limited liability company and corporation. From 2021–2023, Alan Thomas also acted as a principal to the Earth-Wise entities.

35. Defendant **Joshua Hukill** is a resident and domiciliary of the State of Texas. Upon information and belief, in April 2019, Joshua Hukill joined Reliable One Resources as an employee in charge of the Receivership Entities' information technology and marketing materials to investors. However, from December 2019–2023, Joshua Hukill had fully integrated himself into the Receivership Entities' operations and held himself out to investors as a principal of the Pinta Dome Entities, and particularly GeoEnhanced Technologies.

36. Defendant **Michael Kaminksi** is a resident and domiciliary of the State of Kansas. Upon information and belief, from 2016–2023, Michael Kaminski acted as the

Chief Operations Officer of GeoEnhanced Technologies and held himself out to investors as a research scientist and the inventor of GeoEnhanced Technology's revolutionary surveying system. In 2020, Michael Kaminski briefly left the scheme over a dispute with Cameron Cravey and Kenneth Wiedrich related to distributions of investor funds to which he believed himself entitled. During this time, Michael Kaminski reported the Receivership Entities to the SEC and posted about the ongoing fraud on the social media site Reddit. Exhibit A, Email from M. Kaminski to C. Cravey re Reddit "Fraud" Post detailing Demand Brands Fraud; Exhibit A.1, Screenshot of M. Kaminski Reddit Post under alias "Johnsom3". Exhibit B, Email from M. Kaminski to C. Cravey re Reporting Cravey to SEC; Exhibit B.1, Attached Image from SEC Website Confirming Submission of Report by M. Kaminski.

37. Defendant **Claude Shannon "Droop" Cravey** ("Shannon Cravey") is a resident and domiciliary of the State of Texas. Upon information and belief, from 2016–2023, Shannon Cravey acted as a principal of the Receivership Entities, including by serving as, among other executive roles, a Director of Reliable One Resources, Chairman of GeoEnhanced Technologies, President of Helios Extraction Limited, Vice President of Pinta Dome Operations, LLC, and Management of the Pinta Dome Joint Venture, LLC. Shannon Cravey is the brother of Defendants Cameron and Kim Cravey.

38. Defendant **John Hank Diesel** ("Hank Diesel") is a resident and domiciliary of the State of Texas. Upon information and belief, from 2021–2024, Hank Diesel acted as a principal of the Receivership Entities, including by, among other executive roles, holding himself out to investors as the President of Helios Extraction Limited, LLC and an executive of Pinta Dome Operating, LLC. Hank Diesel also served as the Chief Financial

Officer for Infinity Cell, a Wyoming corporation ("Infinity Cell"). He retains that title for its successor, Infinity Bio-Tech, a Texas limited liability company.

39. Upon information and belief, Defendant **Chauncey Sayre** is a resident and domiciliary of the State of California. Upon information and belief, between 2021–2024, Chauncey Sayre acted as a principal to the Receivership Entities, including by serving as, among other executive roles, President of Infinity Cell and a principal to Reliable Enterprises, Inc.

40. Defendant **John Cameron Cravey** ("John Cravey") is a resident and domiciliary of the state of Texas. Upon information and belief, between 2015–2023, John Cravey held himself out to investors in numerous executive roles, including at least, a VP of Business Development for Reliable One Resources, a principal for GeoEnhanced Technologies, and the Chief Information Officer for J&R Oilfield Specialists. During this time, John Cravey actively marketed and sold investment opportunities for the Receivership Entities, and along with Joshua Hukill, developed the entities' marketing materials. John Cravey is the son of Defendants Cameron and Kim Cravey.

41. Defendant **Mic Fuhrman** is a resident and domiciliary of the State of Nevada. Upon information and belief, from 2018–2023, Mic Fuhrman held himself out to investors as principal and officer of at least Reliable One Resources, Quantum Filtration, GeoEnhanced Technologies, One Earth, Alchemy LLC, Rare Earth Minerals, and the Earth-Wise ventures. During this time, Mic Fuhrman co-owned the Arizona corporation, Defendant **GSET Management Corp.** ("GSET").

42. Defendant **Joseph Michael Sierakowski** ("Mike Sierakowski") is a resident and domiciliary of the State of Nevada. Upon information and belief, from 2018–

2021, Mike Sierakowski held himself out to investors as principal and officer of at least Reliable One Resources, Quantum Filtration, GeoEnhanced Technologies, One Earth, Alchemy LLC, Rare Earth Minerals, and the Earth-Wise ventures. During this time, Mike Sierakowski was also listed as a co-beneficial owner of GET with Defendant Mic Fuhrman.

43. Defendant **Adrian Garcia** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2016–2018, Adrian Garcia acted as a touter for Reliable One Resources, selling shares of the company to investors and profiting from undisclosed commissions. From 2019–2023, upon information and belief, Adrian Garcia acted as a principal of the Receivership Entities, serving as the "Vice President," "Lead Geologist," and "Managing Officer" for the Pinta Dome Entities and GeoEnhanced Technology. In these roles, Adrian Garcia held himself out to investors as the developer of a "revolutionary electro seismic surveying system" that could discover previously undiscoverable oil and gas deposits. Adrian Garcia is son-in-law to Defendants Cameron and Kim Cravey.

44. Defendant **Bryon Thomas Warnes** ("Tom Warnes") is a resident and domiciliary of the State of Texas. Upon information and belief, from 2015–2023, Defendant Tom Warnes acted as a principal for the Reliable One and Quantum Filtration entities and held himself out to investors as Reliable One's Chief Operating Officer. Tom Warnes is also the registered agent of the delinquent Colorado limited liability company, Defendant **Desert Ridge LLC**. Upon information and belief, Tom Warnes is the sole owner of Desert Ridge LLC, which has failed to adhere to corporate formalities.

45. Defendant **Trent Kelley** is a resident and domiciliary of the State of Utah. Upon information and belief, from 2018–2023, Trent Kelly acted as a principal for the Receivership Entities, and the Chief Operating Officer for Reliable One Resources.

46. Defendant **Troy Abbott** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2018–2023, Troy Abbott acted as principal of the Pinta Dome Entities' and served as their "Vice President of Marketing." He likewise acted as a principal of Infinity Cell. During this time, Troy Abbott managed and actively participated in the sale of the Pinta Dome and Infinity Cell securities to investors. He likewise helped to create the marketing materials the Receivership Entities presented to potential investors.

47. Defendant **Skylar Cotton** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2020–2023, Skylar Cotton served as a principal of the Pinta Dome Entities and Black Pearl Petroleum. He is married to Defendant Alexis Cravey Cotton and is the son-in-law of Defendants Cameron and Kim Cravey.

48. Defendant **Alexis Cravey Cotton** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2017–2023, Alexis Cravey served as the "AP / AR Manager" for the Receivership Entities. She is married to Defendant Skylar Cotton and the daughter of Defendants Cameron and Kim Cravey.

49. Defendant **Kristi Evans** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2015–2023, Kristi Evans served as the Receivership Entities' "Executive Administrator." In this role, Kristi Evans "supported [the entities'] C-Level executives, Directors, and all Board Members," and, along with Alexis Cravey Cotton, managed accounts payable. She is the daughter of Defendants Cameron and Kim Cravey.

50. Defendant **Timothy Roberts** is a resident and domiciliary of the State of Texas. Upon information and belief, from 2017–2021, Timothy Roberts acted as a promoter to individual investors for the Receivership Entities. During this time, Timothy Roberts earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, upon information and belief, Timothy Roberts never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

51. Defendant **Monte Fauset** is a resident and domiciliary of the State of Texas. Upon information and belief, between 2017–2023, Monte Fauset acted as a promoter to individual investors for the Receivership Entities. During this time, Monte Fauset earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Monte Fauset never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

52. Defendant **Charlie Wagner** is a resident and domiciliary of the State of Texas. Between 2017–2023, Charlie Wagner acted as a promoter to individual investors for the Receivership Entities. During this time, Charlie Wagner earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Charlie Wagner never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

53. Defendant **Joel Hukill** is a resident and domiciliary of the State of Texas. Between 2017–2021, Joel Hukill acted as a promoter to individual investors for the Receivership Entities. During this time, Joel Hukill earned a percentage of every

investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Joel Hukill never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

54. Defendant **Ray Boykin** is a resident and domiciliary of the State of Texas. Between 2015–2016, Ray Boykin acted as a promoter to individual investors for the Receivership Entities. During this time, Ray Boykin earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Ray Boykin never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

55. Defendant **Dean Loveland** is a resident and domiciliary of the State of Texas. Between 2016–2018, Dean Loveland acted as a promoter to individual investors for the Receivership Entities. During this time, Dean Loveland earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Dean Loveland never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

56. Defendant **Brandy Fields** is a resident and domiciliary of the State of Texas. Between 2016–2018, Brandy Fields acted as a promoter to individual investors for the Receivership Entities. During this time, Brandy Fields earned a percentage of every investment she secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Brandy Fields never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

57. Defendant **Cary Rothman** is a resident and domiciliary of the State of California. Between 2017–2021, Cary Rothman acted as a promoter to individual investors

for the Receivership Entities. During this time, Cary Rothman earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Cary Rothman never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

58. Defendant **Robie Williams** is a resident and domiciliary of the State of Texas. Between 2017–2023, Robie Williams acted as a promoter to individual investors for the Receivership Entities. During this time, Robie Williams earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Robie Williams never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

59. Defendant **John Kenney** is a resident and domiciliary of the State of Texas. Between 2017–2020, John Kenney acted as a promoter to individual investors for the Receivership Entities. During this time, John Kenney earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, John Kenney never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

60. Defendant **Jeremy Neenan** is a resident and domiciliary of the State of Louisiana. Between at least 2019–2023, Jeremy Neenan acted as a promoter to individual investors for the Receivership Entities. During this time, Jeremy Neenan earned a percentage of every investment he secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Jeremy Neenan never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

61. Defendant **Sharisa Ward** is a resident and domiciliary of the State of Oklahoma. Between 2016–2019, Sharisa Ward acted as a promoter to individual investors for the Receivership Entities. During this time, Sharisa Ward earned a percentage of every investment she secured for the Receivership Entities, but upon information and belief, never disclosed those commissions to the investors. Further, Sharisa Ward never secured a license to sell securities as required by federal securities laws. *See* 15 U.S.C.A. § 78o.

62. Defendant **Haleigh Morgyn Owens** is a resident and domiciliary of the State of Texas. From at least July 2022–September 2023, Haleigh Morgyn Owens was Defendant Cameron Cravey's paramour upon information and belief. In addition to being the beneficiary of luxury vacations, spa treatments, shopping sprees, and gifts, Haleigh Morgan Owens also received over $140,000 in direct distributions of investor funds to which she has no rightful claim. Upon information and belief, Haleigh Morgyn Owens never performed any work that would entitle her to receive these funds. While not directly involved in the operations of the Receivership Entities', upon information and belief, Haleigh Morgyn Owens was aware of and complicit in the scheme to defraud investors. She personally benefitted from the same.

63. Defendant **Haley Cravey** is a resident and domiciliary of the State of Texas. In at least 2017, and between, December 2021–December 2022, Haley Cravey furthered the Defendants' scheme to defraud investors. During these times, Haley Cravey's responsibilities included bookkeeping, creating publications for investors, and managing investor inquiries. At all times relevant, upon information and belief, Haley Cravey was aware of and complicit in the scheme to defraud investors. She personally benefitted from

the same. Upon information and belief, Haley Cravey is the niece of defendant Cameron Cravey.

64. Defendant **Nancy Cravey** is a resident and domiciliary of the State of Texas. Between 2014–2022, Nancy Cravey held herself out as an "Administrative, AP/AR" personnel for Reliable One Resources. However, upon information and belief, Nancy Cravey never held or completed any substantive responsibilities which would entitle her to the funds she received. At all times relevant to this Complaint, upon information and belief, Nancy Cravey was aware of and complicit in the scheme to defraud investors. She personally benefited from the same. Nancy Cravey is the wife of Defendant Claude Shannon Cravey and mother of Defendant Haley Cravey.

## JURISDICTION AND VENUE

65. Subject matter jurisdiction over this action is vested in this Court under the Securities Act of 1933, 15 U.S.C. § 77v, and the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, as it alleges violations of the federal securities laws. Consequently, the Receiver's claims involve federal questions of law under 28 U.S.C. § 1331.

66. Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

67. This Court has personal jurisdiction over the Defendants, and venue is proper in this Court under 28 U.S.C. § 1391. The Defendants based their scheme out of the Eastern District of Texas, many of the Defendants live in the State of Texas, all the Defendants had significant and ongoing contacts related to these claims within the State of Texas, and a substantial part of the acts or omissions giving rise to the causes of actions stated herein occurred in this District. Further, Paragraph 13 of this Court's Receivership

Order stays all other litigation related to this Receivership or its relevant parties absent an order from this Court. Receivership Order at 15–16.

## FACTS

### I. THE SCHEME

68. Between 2015–2023, Defendants Shane Traveller, Cameron Cravey, Kenneth Wiedrich, Bob Shear, James Lookabaugh, David Traveller, Jim McCann, John Collier, Bill Abt, Alan Thomas, Joshua Hukill, Michael Kaminski, Shannon Cravey, Hank Diesel, John Cravey, Mic Fuhrman, Mike Sierakowski, Adrian Garcia, Tom Warnes, Trent Kelly, Troy Abbott, Chauncey Sayre, Skylar Cotton, Alexis Cravey Cotton, and Kristi Cravey Evans (collectively "Insider Defendants") operated a scheme in which they sold shares or other securities in numerous business entities that, beyond their registration, never existed.

69. When investors would catch on to one scheme's fraud or lose interest, as John Cravey put it in an email to Kenneth Wiedrich, the Insider Defendants would simply be "done using [it]." Exhibit C, Dec. 8, 2022 Email from J. Cravey to Ken Wiedrich. They would move on to the next venture in the scheme.

#### A. Reliable One Resources, Inc.

70. To begin the scheme, Kenneth Wiedrich, acting in concert with at least, Angela Rae Wiedrich, Cameron Cravey, and Anthony Feezel, registered the scheme's first entity, Reliable One Resources with the South Dakota Secretary of State in February 2015. This entity had no assets, employees, products, or business operations.

71. By July 2015, the Insider Defendants began selling the company's shares in earnest. At or around that time, Cameron Cravey recruited Jim McMann to serve as the scheme's "Vice President of Investor Relations" and John Collier as its "Vice President of Business Development." Though they wore different titles, the men's roles were the same—to aggressively market and sell investments in Reliable One Resources and placate individuals who began asking uncomfortable questions.

72. Here was their pitch: As marketed to investors, Reliable One Resources was a start-up research and development company that had developed "industry disrupting" water filtration technology that could extract pollutants at a fraction of the cost. The Defendants' publications to prospective investors show that the Defendants claimed that Reliable One Resources operated facilities in California and Utah which proved so profitable that they purportedly paid for themselves in just months. Despite this purported profit, the Insider Defendants claimed that Reliable One Resources needed to raise additional capital to launch a newly developed filtration technology that they claimed would revolutionize the oil and gas industry. According to the Insider Defendants' publications, Reliable One had developed a method to shrink its filtration process to the size of a standard trailer, thus allowing the Defendants to deploy their filtration technology remotely. As Defendants explained, this innovation would disrupt numerous major industries that generate polluted water—but starting with oil and gas.

73. In 2015, then-recent discoveries of the Eagle Ford and Permian Basin oil fields ignited a boom in oil and gas companies' use of a technique called hydraulic fracturing ("fracking"). Fracking wells extract petroleum by shooting chemically enhanced water and sand to break up shale rock formations encapsulating underground petroleum

deposits. As a byproduct, these drills generate immense quantities of polluted water which oil and gas companies must treat before they may dump it. Consequently, fracking drills generally must bear considerable expense to capture, store, and then haul the water to the treatment facility, which may be miles away.

74. Enter Reliable One Resources. By developing its remotely-deployable water filtration technology, Reliable One Resources had supposedly eliminated the industry's need to capture or haul its polluted water. Moreover, as first mover, Reliable One Resources had generated a significant competitive advantage with which it could charge a premium to filter the industry's polluted water, while simultaneously capturing significant market share. And once they had solidified their position in the oil and gas industry, Reliable One Resources was primed to disrupt—and profit from—other industries, including agriculture, construction, and chemical manufacturing. The returns were all-but guaranteed.

75. The pitch worked. Numerous investors began purchasing shares or other securities in this fictitious company, with some investing their entire life savings.

### B. The Scheme Expands to Add New Entities and New Insiders

76. As the scheme found success with Reliable One Resources, the initial insiders began recruiting family members and trusted associates to help expand the scheme's operations. By 2019, the relevant insiders included at least David Traveller, Shannon Cravey, John Cameron Cravey, Adrian Garcia, Joshua Hukill, Krisit Evans, Alexis Cravey, Robert Shear, James Lookabaugh, Bill Abt, Mic Fuhrman, Mike Sierakowski, Tom Warnes, Richard Barber, Michael Kaminski, Hank Diesel, Trent Kelly,

Troy Abbott, and Shane Traveller. With the additional help, the Insider Defendants began registering, "operating", marketing, and selling securities in new entities by repeating the same, proven tactics they used to sell securities in Reliable One Resources.

*1. GeoEnhanced Technologies*

77. To start, in 2017, the Insider Defendants caused Richard Barber and Shannon Cravey to form GeoEnhanced Technologies. According to publications mailed to prospective investors, the Insider Defendants claimed that GeoEnhanced Technologies' "C.O.O." and "Inventor," Michael Kaminski, developed "patent-pending," "industry disrupting" electro-seismic wave technology—a technology very similar to that which Shane Traveller touted in his previous securities fraud scheme. Like in *Huttenstine*, here, the Insider Defendants claimed this new technology could locate and characterize underground petroleum deposits from the surface, thus eliminating prospectors' need to drill expensive test wells. Case No. 4:05-CV-00152, at 3–4. The results from their third-party tests were so successful, they claimed, that in just the few years since starting operations, the entity had already discovered "over 100 million barrels in [petroleum] reserves using GeoEnhanced's electro-seismic [sic] technology."

78. Later that year, the Insider Defendants also caused the registration and marketing of a third entity, J&R Oilfield Specialists, a Wyoming limited liability company. According to the Defendants' publications to investors, J&R Oilfield Specialists offered "services, chemicals, and total supervision of oil and gas projects." As before, the Insider Defendants mailed false and materially misleading representations publications to potential investors to solicit and secure investments into this entity. However, notably, they also used

this entity to bolster their appearance of legitimacy by treating it as a contractor to Reliable One in communications with third parties in which the Insider Defendants were seeking to secure financing.

2. *Reliable Enterprises Inc. and Benwood Processing*

79. Next, in 2018, the Insider Defendants recruited Defendants Mic Fuhrman, Mike Sierakowski, and Trent Kelly to spearhead the scheme's next expansions: Reliable Enterprises Inc. and Benwood Processing. The Insider Defendants (now including Mic Fuhrman, Mike Sierakowski, and Trent Kelly) pitched Reliable Enterprises, Inc. as the operator of a saltwater injection well located in Athens County, Ohio. The oil and gas industry typically uses saltwater injection wells to return fracking wells' wastewater underground—a process the Insider Defendants' water filtration technology supposedly rendered obsolete.

80. To resolve this juxtaposition, the Insider Defendants touted the new well as an already-profitable enterprise that could cashflow Reliable One's water filtration facilities. They likewise claimed that Reliable Enterprises, Inc. "and its affiliates [held] proprietary technology and processes" which allowed them to "recycle up to 100 percent [of the wastewater received from oil and gas well operators]."[5] These innovations purportedly "cause[d] new and very profitable additional revenue streams" for the venture. However, as before, the scheme's internal documents reveal that the Insider Defendants'

[5] While not directly stated, the Insider Defendants' publications heavily imply that Reliable Enterprises, Inc.'s COO, Trent Kelly, developed this technology in collaboration with Texas A&M University at Corpus Christi.

representations regarding Reliable Enterprises, Inc.'s profitability and technology were entirely false.

81. Around the same time that the Defendants began selling securities tied to Reliable Enterprises, they also began marketing and selling securities in Benwood Processing. As sold to investors, the Insider Defendants planned to use this entity to operate a forthcoming water treatment facility in Benwood, West Virginia. This entity would replicate the Defendants' processes already in use at their current (profitable) facilities; however, it would be strategically located to capitalize on the Midwest's fracking boom. Of course, as before, neither the facilities nor technologies that the Insider Defendants claimed to have developed ever existed.

82. In conjunction with the Reliable Enterprises and Benwood Processing, the Insider Defendants contemporaneously caused the Receivership Entities to acquire BBU Trucking. Upon information and belief, the Defendants planned to use the revenue from BBU Trucking to pay its debts to creditors and issue distributions to investors solely as a means of convincing those parties to further invest in the Insider Defendants' scheme. However, after completing their acquisition of BBU Trucking, the Defendants discovered the company was not nearly as profitable as they believed and soon abandoned its operations. Even still, the Defendants continued to tout BBU Trucking (as well as promises of a forthcoming water treatment facility) to market and sell securities in Reliable Enterprises and Benwood Processing.

83. From Reliable Enterprises, Inc.'s start, and as with J&R Oilfield Specialists, the Insider Defendants used a separate corporate entity, GSET Management Corporation

(“GSET”), to cloak their communications to potential investors in feigned legitimacy. GSET is an Arizona corporation for which Mic Fuhrman and Mike Sierakowski serve as the sole shareholders and directors. To investors, the Insider Defendants touted GSET as an expert in water treatment technology and facilities. They likewise boasted the numerous patents Mike Sierakowski and Mic Fuhrman had secured in relevant technologies. However, upon information and belief, GSET held neither experience nor expertise in designing, managing, or operating water treatment facilities, as the Insider Defendants claimed to investors. Further, upon information and belief, at all times relevant to this Complaint, Mic Fuhrman and Mike Sierakowski were principals within the Insider Defendants’ scheme and Reliable One Resources. Thus, upon information and belief, Mic Fuhrman and Mike Sierakowski exclusively used GSET as a vehicle to further the Insider Defendants’ scheme to defraud investors. And to the extent that GSET served a non-fraudulent purpose, if any, GSET and Reliable One formed a general partnership in 2018.

84. In 2019, the Insider Defendants formalized GSET and Reliable One’s corporate ties by causing the entities to jointly form and own a South Dakota corporation, Alchemy Enterprises, LLC (“Alchemy”). Initially proposed by Mic Fuhrman, the Insider Defendants marketed Alchemy as a precious metals extraction company for which they were selling debt securities to purportedly finance construction of a facility in South Indiana. The concept would serve as the foundation for the Insider Defendants’ future scheme with the Earth-Wise Entities. However, before Alchemy gained momentum, the Coronavirus pandemic caused the Insider Defendants to shift focus to fronts that better capitalized on current chaos and investors’ fears.

*3. Demand Brands*

85. Contemporaneously, the Defendants likewise resumed selling securities in a previously used Washington corporation, Demand Brands, Inc ("Demand Brands"). Prior to 2019, the Insider Defendants sold Demand Brands to investors as a distributor of CBD-based products that was poised to capitalize on the swelling trend to legalize marijuana. However, after a dispute relating to Insiders' distributions erupted between Michael Kaminski and other Insider Defendants, the Insider Defendants attempted to freeze out Michael Kaminski by transferring GeoEnhanced Technologies' assets to Demand Brands. The Insider Defendants then used Demand Brands as a proxy company to continue the sale of securities under the GeoEnhanced Brand without Michael Kaminski.

86. In retaliation, Michael Kaminski first reported Demand Brands and the other Insider Defendants' fraud to the SEC. Then, in a post to the social media platform Reddit, he published an exposé detailing the Insider Defendants' fraudulent scheme. The publicity promoted the Insider Defendants to quickly pacify Michael Kaminski with an agreement that reincorporated him into the scheme. Accordingly, the scheme continued.

*4. Quantum Filtration and Re:Earth*

87. In early 2020, the Insider Defendants dramatically altered the scheme's focus to take advantage of the global Coronavirus pandemic. On March 9, 2020, the Insider Defendants, in concert with Sherif Soliman, caused the formation of Quantum Filtration as a wholly owned subsidiary of Reliable One Resources.[6] At the time, the Insider Defendants claimed to have modified Reliable One Resources' desalination technology into a mask that proved more effective and more comfortable than any other mask on the market. In

---

[6] Sherif Soliman and his entity, Matregenix, Inc., a Delaware corporation, are the subject of a second lawsuit by the Receiver related to the Insider Defendants' ongoing fraud scheme.

their April 2020 update to investors, for example, the Insider Defendants bragged that the company's independent lab tests "came back so promising that Reliable's scientists believe that the mask has the potential to be rated N99.7, [meaning it blocked 99.7% of all virus particles compared to the industry benchmark of 95% for an N95 mask]." At the same time, they boasted that "[a]ll indications [pointed] to Reliable's masks having a far better breathability" and fit than traditional N95 surgical masks.

88. In subsequent marketing materials to potential investors, the Insider Defendants doubled-down on these claims. Publications marketing Quantum Filtration securities to investors, for example, claim that Quantum Filtration expected to receive FDA approval within the month, and NIOSH certification in one to two months. They likewise claim the company's masks are "99.9975%" effective against airborne pathogens, "and potentially more importantly, the ONLY mask that can deactivate and kill Covid-19 on contact." (emphasis in original). Meanwhile, this mask still proved more breathable, comfortable, and cost effective than competitors' masks. To take advantage of this competitive advantage, the Insider Defendants represented they had set a long-term goal to produce over 300-million masks per month. If met, this target would grant Quantum Filtration an effective monopoly over the market's $9-billion annual demand. Investors' funds would allow Quantum Filtration to quickly reach this production target, and in return, promised considerable returns in the future.

89. At the same time as the Insider Defendants began marketing Quantum Filtration, they also began selling securities in Re:Earth. According to publications to potential investors, Reliable One Enterprises formed Re:Earth after "converting its metal extraction technology [Alchemy] into a hand sanitizer and disinfectant." Notably, the

Insider Defendants claimed their hand sanitizer and disinfectants proved "99.997%" effective against germs—an identical percentage of effectiveness that the Insider Defendants claimed for Quantum Filtration's masks technology.

90. As before, neither of these technologies existed. By 2023, the Insider Defendants failed to produce either a single mask or bottle of hand sanitizer. Rather, after investors repeatedly pressed the Insider Defendants for samples of the products the Insider Defendants claimed they had produced, the Insider Defendants sent them masks and hand sanitizer produced by other companies, like 3M.

5. *The Earth-Wise Entities*

91. After launching Quantum Filtration and Re:Earth, the Insider Defendants returned to marketing Alchemy's operations with a new company, Earth-Wise Minerals & Mining, LLC.[7] According to Defendants' publications, Earth-Wise Minerals & Mining, LLC purportedly operated surface mines in Utah and Nevada that extracted precious metals (i.e., gold) from near-surface shale deposits. Like with Alchemy, Earth-Wise Minerals & Mining, LLC used a "proprietary process" to chemically extract the rare earth metals from the mined shale. Of course, this "proprietary process" proved so effective that it had increased Earth-Wise's profits "exponentially" while also eliminating the environmental impact inherent in competitors' similar technology. Naturally, these claims were false. Nevertheless, the Insider Defendants promoted the company in earnest.

---

[7] The Defendants may have also marketed Earth-Wise Minerals & Mining, LLC as "Earth-Wise Organics LLC."

92. To further promote Earth-wise, in 2021, the Insider Defendants formed a joint venture, EWJV, between Earth-wise Minerals & Mining, LLC and Green Tree Management. Just as with Earth-Wise Minerals & Mining, LLC, the Insider Defendants sold securities in EWJV by fraudulently marketing the entity as a surface mining company that had developed a "proprietary process" to extract gold from near-surface shale deposits.

6. *The Pinta Dome Entities*

93. Beginning in 2021–2022, Shane Traveller, Bob Shear, and Hank Diesel spearheaded the scheme's next expansion, helium mining. In November 2021, the Insider Defendants caused Bob Shear to register Pinta Dome Operating, LLC ("PDO LLC") with the Wyoming Secretary of State. As sold to investors, PDO LLC was a pre-IPO helium mining company with plans to build two helium wells in Holbrook County, Arizona. The Insider Defendants claimed to have used GeoEnhanced Technologies' "proprietary electro-seismic technology" to discovered sizeable helium deposits at both planned sites. But now PDO LLC needed investor funds to build the wells. Based on the Insider Defendants' projections, the discovered deposits promised to yield investors returns between 184% and 1807%. As a bonus, the Insider Defendants claimed that investments in these helium wells qualified as federal "Opportunity Zones," and were thus exempt from any capital gains taxes. Investors quickly began buying shares.

94. Spurred by the success, the Insider Defendants began using the pitch to sell securities in numerous other entities. These included, at least, Pinta Dome Management, Inc.; Helios Extraction Limited, LLC; Ali Petroleum, LLC (a non-registered entity holding itself out as a limited liability company); Pinta Dome Joint Venture, LLC (an unregistered

"joint venture" between PDO LLC and Pinta Dome Management, LLC); Pinta Dome Joint Venture, LLC (an unregistered "joint venture" between PDO LLC and Reliable Enterprises, Inc.); Pinta Dome Joint Venture, LLC (an unregistered "joint venture" between PDO LLC and Ali Petroleum, LLC); and Pinta Dome Joint Venture, LLC (an unregistered "joint venture" between PDO LLC and Green Tree Management, LLC) (collectively, with PDO LLC, the "Pinta Dome Entities").

95. The Insider Defendants' pitch for the Pinta Dome Entities were the same as the pitch for PDO LLC. Each owned and operated helium wells in Holbrook County, Arizona—the same two wells as PDO LLC. Each used GeoEnhanced Technologies' "proprietary electro-seismic technology" to confirm the planned well locations sat on significant helium deposits. And each projected tax-free returns on investments between 184% and 1807%. Indeed, the Insider Defendants used identical publications for each entity, altering only the entities' name and, occasionally, their published management. Yet, by 2024, the Insider Defendant never operated a single helium well or discovered any helium deposits. Thus, like before, the Insider Defendants representations to investors about the Pinta Dome Entities were either entirely fraudulent or materially misleading.

*7. Infinity Cell & the Zephyr Oz Fund*

96. Finally, in 2022, the Insider Defendants also began marketing and selling securities in a biotechnology research and development company, Infinity Cell, LLC. As sold to investors, Infinity Cell, LLC had developed "patent-pending" technologies related to "primordial stem cells." The Insider Defendants fraudulently claimed that Infinity Cell's new stem cell technologies "strengthened immune systems," increased patients' resistance

and ability to fight cancer, and could be used to "prevent negative aging effects and increase internal regeneration." With "over $30 million" already raised, Infinity Cell was "poised to become the standard in multiple applications within the medical sector." These claims were all false. The Insider Defendants moved from selling crude oil to snake oil.

97. Nevertheless, to entice investors, the Insider Defendants again leveraged the promise of tax-free gains through a federal "Opportunity Zone." Along with Zephyr OZ LLC, a California limited liability company ("Zephyr Oz LLC") the Insider Defendants formed a Delaware limited partnership, Infinity Cell Oz Fund I L.P. In this limited partnership, Zephyr Oz LLC served as the general partner and Infinity Cell served as the limited partner. Subsequently, the Insider Defendants sold shares and debt securities to investors for both Infinity Cell and Infinity Cell Oz Fund I L.P.

98. Upon information and belief, the Insider Defendants previously worked with Zephyr Oz, LLC, in 2021. At that time, upon information and belief, the Insider Defendants began marketing and selling securities in Infinity Cell's predecessor, EcoTex Technologies, LLC, a Texas limited liability company ("EcoTex Technologies"). Upon information and belief, the Insider Defendants worked with Zephyr Oz, LLC to form EcoTex Holdings, LLC, a Texas limited liability company ("EcoTex Holdings"). Upon information and belief, Chauncey Sayre spearheaded the efforts related to EcoTex Technologies and marketed the entity alongside entities related to the Receivership Entities.

99. When the Insider Defendants transitioned to selling securities in Infinity Cell, Chauncey Sayre continued spearheading the front. The Insider Defendants also

recruited Jerry Miller, with whom Cameron Cravey conspired on an earlier securities fraud scheme, to serve as "COO," and Alejandro Velasco to serve as the lead touter and "Vice President of Mexico Operations." Hank Diesel served as the entity's Chief Financial Officer. Upon information and belief, as of the time of filing this complaint, Chauncey Sayre, Hank Diesel, Jerry Miller, Alejandro Velasco, and the other Insider Defendants have continued marketing and selling securities in Infinity Cell and its related entities.

### C. Defendants Supported Their Fraudulent Claims with Detailed Publications

100. To support their representations, the Insider Defendants mailed potential investors convincing publications that thoroughly detailed the entity the scheme was then promoting. Primarily, these publications were "books," PowerPoint slides called "decks," and prospectuses that detailed the entities' technology, financial performance, financial projections, and management. The Defendants included images of the entities' claimed operations, technical drawings, testimonials, and purported "independent laboratory test results" that demonstrated their technology's effectiveness. On the entities' financials, the Defendants offered charts detailing their current assets and cashflows, plans for invested funds, and the significant future revenues they projected to generate. In some cases, they even detailed the expected share values after they finalized their forthcoming Initial Public Offerings.

101. As above, the Defendants' representations within these publications were either entirely fictitious or materially misleading.

102. Notably, the Defendants even used these publications to conceal the scheme and the relevant entities' true leadership from both investors and the SEC. Indeed, even from the start of the scheme, all Defendants actively concealed Cameron Cravey's involvement by, at least, excluding him from any public filings, omitting him from their published list of officers and board members, and assuring investors who discovered his involvement that they had removed him from the entities. Similarly, once investors discovered that the SEC previously sanctioned Kenneth Wiedrich for an earlier fraud scheme, the Defendants took active steps to conceal his participation from potential investors. By the time Shane Traveller's participation began in earnest in or around 2018, the Insider Defendants learned from their errors and never publicly disclosed his participation.

103. Rather, whenever the scheme formed a new entity, another Insider would act as their proxy. For example, in public filings, Tamara Traveller held herself out as the Managing Member of Pinta Dome Helium. Nevertheless, she never participated in the entity's daily affairs and admits that she only proxied in this capacity to conceal her husband's involvement from the SEC and investors.

104. Meanwhile, the Receivership Entities' internal documents detail Cameron Cravey, Kenneth Wiedrich, and Shane Traveller's intimate participation. Their organizational charts list Cameron Cravey as its President and Chairman, Kennth Wiedrich as its CEO, and Shane Traveller as the CFO. Internal communications note their involvement and defer to their decision-making. And company-wide emails assured insiders, that despite the scheme's representations to nervous investors that Cameron

Cravey and Kenneth Wiedrich were no longer involved with these entities, both men remained in their previous roles.

## II. The Scheme's Process to Lure Investors

105. Immediately after founding each "company", the Insider Defendants began selling shares in that entity. To market these entities, the Insider Defendants would pay for leads or targets from several companies. These leads would contain the names of potential investors, their contact information, and occupation. Cameron Cravey generally oversaw the divvying up of leads among the scheme's network of promoters, often filtering out those working in oil and gas industries as risky.

106. Promoters relevant to this Complaint include Timothy Roberts, Monte Fauset, Charlie Wagner, Joel Hukill, Ray Boykin, Dean Loveland, Brandy Fields, Cary Rothman, Robie Williams, John Kenney, Jeremy Neenan, and Sharisa Ward (collectively the "Promoters"). None of the Promoters ever secured a license to sell securities.

107. The Promoters would call their assigned leads following a script that the principals collectively drafted. If the call went well, the Promoter would arrange a call between the investor and a principal; however, before the call ended, the Promoter stressed the principal's busy schedule and would secure the investor's absolute promise to show up on the call. Within the next few days, a principal would call the investor and answer any questions about the entity they were then selling, expanding on the lies spun in the Defendants' publications.

108. With the investor primed, the Promoter would close the deal. Generally, this required answering any follow up questions, sending additional publications, and mailing all investment documents, like the Private Placement Memorandum and wiring

instructions. If the Promoter and the Insider Defendants were successful, the investor would send their savings to the principals or their escrow agent via bank wires or checks through the mail. The Insider Defendants kept most of this money but paid the Promoter a percentage of the funds secured as a commission.

109. Neither the Promoters nor principals ever disclosed these commissions to the investors.

### III. DEFENDANTS' CONVERTED INVESTOR FUNDS FOR THEIR PERSONAL USES

110. While the Insider Defendants plowed some funds back into the entities' operations, the Receivership Estates' banking records evidence that the majority of the funds were likely redirected for the Defendants' personal benefits.

111. Despite diligent efforts, the Receiver lacked any reasonable means to discover the Defendants' tortious conduct until, at earliest, February 2024. First, the Receiver only gained meaningful access to the Defendants' internal records in a readable format, at earliest, on November 20, 2023; however, this collection effort continued in to March 2024.[8] In total, the Receiver recovered over 2.4 million pages of the Defendants' documents, which naturally, required extensive time to review. Second, though she began

[8] The Receiver initially recovered 152 boxes of documents from the Insider Defendants' primary place of business on June 28, 2023. These documents contained important information related to the Insider Defendants' assets, liability, and prior operations of the Receivership Entities. However, it lacked sufficient documentation to evidence the Defendants' scheme to defraud investors. And, even if sufficient evidence was present, it was neither readily evident to her nor to anyone not privy to the internal workings of the Receivership Entities. Rather, the only feasible means the Receiver had to discover that the transfers were fraudulent in nature was to have an expert examine the Entities' accounting records. *See Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 197 (5th Cir. 2013) (prior history omitted). Accordingly, the Receiver lacked any reasonable means to discover the Defendants' tortious conduct until she recovered and could reasonably analyze the Defendants' emails, bank records, and other financial documents. *See Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 834 (N.D. Tex. 2011). As noted above, the Receiver could not reasonably compete this analysis before February 2024.

receiving the Receivership Entities' banking records beginning, at earliest, September 18, 2023, these records required unique expertise to review and analyze. The Receiver promptly sought court leave to hire forensic accountants to provide the required expertise, which the court granted on February 1, 2024. The Receiver lacked any reasonable means to discover the Defendants' tortious conduct until the forensic accountants received reasonable opportunity to analyze the Defendants' financial records.

112. After a reasonable time to review the Defendants' considerable financial records, the forensic accountants' analysis of the Receivership Entities' bank records revealed numerous distributions to the Defendants personal bank accounts that were never approved by the entities' members/directors and exceed amounts permissible under state law or the entities' respective articles of incorporation. Importantly, because the Receivership Entities use ADP to pay employee wages, these distributions are clearly distinct from any wage payments the defendant may have received from the Receivership Entities. Additionally, some recipients of these distributions, like Defendants Kim Cravey, Tamara Traveller, Haleigh Blayne Owens, and defendants' family members received significant distributions of investor funds for no work performed.

113. Similarly, this forensic analysis evidenced additional instances where, though the Defendants did not transfer funds to their personal bank accounts, they nevertheless still converted the funds for their personal use and enjoyment. Bank transaction records, for example, detail: lavish, luxury domestic and international trips (with one weekend trip to Las Vegas, Nevada costing investors at least $95,000); shopping sprees for luxury designer goods; and spending on personal expenses, like groceries. In short, the Insider Defendants treated the entities' bank accounts as their own.

114. Fortunately, the percentage of the investor funds that the Defendants received in wrongful distributions or retail spending can be traced. Unfortunately, these expenditures comprise just a fraction of the >$40 million in investor funds that the Receivership Entities received. Upon information and belief, the Insider Defendants transferred most of the funds out of the Receivership Entities to obstruct the Receiver and this Court's efforts to claw these funds back for investors.

115. Indeed, the Receivership Estates' internal records detail numerous entities that the Insider Defendants formed with no apparent reason. In many cases, these entities have layers of beneficiaries—often other non-obvious corporate entities—that can only suggest an intent to use these entities to conceal transfers of investor funds.

116. Nevertheless, in this action, the Receiver seeks to recover these funds, as well as statutory and punitive damages, her costs, and attorneys' fees. As alleged below, Defendants' actions constitute, at least, violations of federal and Texas securities laws, Texas corporate law, and Texas common law.

## CAUSES OF ACTION

### COUNT I
### Violations of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5
### (Against the Insider Defendants)

117. Receiver incorporates each preceding paragraph as if fully stated herein.

118. By engaging in the conduct described above, Defendants directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting

to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit on the purchaser.

119. Defendants knew, or were reckless in their disregard, that they employed devices, schemes, and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other Plaintiff.

120. By engaging in the conduct described above, the Insider Defendants each violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5, and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

121. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the Receiver lacked any reasonably feasible means to discover this cause of action until a reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

**COUNT II**
**Violations of the Texas Securities Act, Tex. Gov't. Code §§ 4008.052, 4008.055**
**(Against the Insider Defendants)**

122. Receiver incorporates each preceding paragraph as if fully stated herein.

123. As described above, the Insider Defendants' conduct violates Section 4008.052 of the Texas Securities Act. The Insider Defendants concocted a scheme to

intentionally deceive investors in connection with the sale of securities in the Receivership Entities.

124. The Insider Defendants offered, marketed, and sold shares in the Receivership Entities by means of materially, intentionally misleading statements and omissions. The Insider Defendants created, or caused to be created, numerous publications that were designed to convince potential investors to purchase shares in the Receivership Entities. These publications included false claims that the Receivership Entities owned ground-breaking technology and fraudulent statements on the entities' financial positions and projections. Additionally, the Insider Defendants both intentionally concealed that several principals previously faced adverse action from the SEC and private parties for defrauding investors and fraudulently bolstered the resumes of the entities' management. The Insider Defendants subsequently sent these publications to countless investors who, upon reliance of these representations, invested over $40 million in the Receivership Entities.

125. When the Insider Defendants published their statements on the Receivership Entities' technology, finances, and leadership, there was a substantial likelihood that a reasonable investor would have viewed the Insider Defendants' representations as important to their decisions on whether to invest and altered the total mix of information available to investors.

126. The Insider Defendants sold, or acted as the seller's agent, and successfully solicited investors to purchase securities in the Receivership Entities. In doing so, the Insider Defendants were beneficiaries to any investments the Receivership Entities

secured, and consequently, were at least partially motivated by a desire to serve their own financial interest.

127. The Insider Defendants sold the securities of the Receivership Entities to investors in Texas.

128. When the investors purchased the shares of the Receivership Entities, they did not know that the Insider Defendants' statements and omissions were materially false or misleading.

129. As a result of the Insider Defendants' materially false and misleading statements and omissions, Receiver is entitled to damages pursuant to Tex. Gov't Code § 4008.057 and the Receivership Order, in an amount to be calculated at trial.

130. Because the Receiver was required to retain counsel and experts to prosecute this claim, she is entitled to an award of costs and reasonable attorneys' fees, pursuant to Tex. Gov't Code § 4008.060.

131. The provisions of the Texas Securities Act apply because there is a substantial nexus between the Insider Defendants' conduct with respect to their false and misleading statements, and the State of Texas. Among other things, the Insider Defendants based their scheme in Texas, communicated many of the false and misleading statements to investors in Texas, and induced investors to invest in entities registered in Texas. Moreover, the Receiver suffered injury in Texas, including because investors decided to buy shares in these entities registered in Texas, and because the securities are accounted for on Plaintiffs' books and records in Texas.

132. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the

Receiver lacked any reasonably feasible means to discover this cause of action until a reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

**COUNT III**
**Violations of the Texas Securities Act, Tex. Gov't. Code § 4008.055**
**(Against David Traveller)**

133. Receiver incorporates each preceding paragraph as if fully stated herein.

134. Upon information and belief, at all times relevant, David Traveller had actual knowledge of the Insider Defendants' scheme to defraud investors yet continued to serve as the Receivership Entities' escrow agent. In the alternative, David Traveller perceived the risk that he was substantially assisting the other Insider Defendants in their securities fraud scheme, and was generally aware of his role in assisting that improper activity. Indeed, despite being a certified public accountant, David Traveller facilitated numerous wire transfers for significant monetary amounts, directly to the principals' bank accounts.

135. In acting as the Receivership Entities escrow agent, David Traveller substantially assisted the scheme by collecting investor funds and distributing those funds to the various entities and to the other principals, directly. Additionally, the Receivership Entities' bank records show transfers of investor funds directly to Traveller and Company, LLC, and Traveller Consulting, LLC, which are David Traveller's wholly owned companies.

136. Accordingly, upon information and belief, David Traveller intentionally deceived investors. Alternatively, by facilitating clearly fraudulent transfers to the other

principals and his entities, David Traveller acted with reckless disregard for the truth of the representations made by the other Insider Defendants.

137. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the Receiver lacked any reasonably feasible means to discover this cause of action until a reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

**COUNT IV**
**Violations of Section 17(a) of the Securities Act of 1933**

138. Receiver incorporates each predicting paragraph as if fully stated herein.

139. Between 2015–2023, the Defendants directly or indirectly offered and sold securities by use of the means of instruments of transportation or communication in interstate commerce by mailing investment materials to actual and potential investors:

a. with scienter, employed devices, schemes, and/or articles to defraud;

b. obtained investor funds by means of untrue statements of material facts and/or materially misleading omissions; and

c. engaged in transactions, practices, and courses of business which operated to defraud and deceive investors.

140. Consequently, the Defendants violated Section 17(a) of the Securities Act. 15 U.S.C. § 77q(a).

141. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the Receiver lacked any reasonably feasible means to discover this cause of action until a

reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

**COUNT V**
**Common Law Fraud**

142. Receiver incorporates each preceding paragraph as if fully stated herein.

143. The Insider Defendants, acting independently and as part of a conspiracy, made affirmative, material misrepresentations to the Receivership Entities and its investors. Among other statements, these included false claims that the Receivership Entities owned ground-breaking technology, and fraudulent representations of the entities' financial positions and projections. Additionally, the Insider Defendants both intentionally concealed that several principals previously faced adverse action from the SEC and private parties for defrauding investors and fraudulently bolstered the resumes of the entities' management.

144. The Insider Defendants made these representations knowing that they were false, or, alternatively, recklessly and without knowledge of their truth.

145. The Insider Defendants made these representations with the intent to deceive the Receivership Entities' investors so that those investors would invest in the Receivership Entities.

146. The Receivership Entities and their investors reasonably relied on these fraudulent representations and wired over $40 million in funds to the Insider Defendants.

147. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the Receiver lacked any reasonably feasible means to discover this cause of action until a

reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

148. Because of the Insider Defendants' fraudulent representations, the Receivership Estate and its investors have suffered significant financial damages. The Receiver is entitled to recover these damages in an amount to be determined at trial.

**COUNT VI**
**Negligent Misrepresentation**

149. Receiver incorporates each preceding paragraph as if fully stated herein.

150. The Defendants, acting independently and as part of a conspiracy, made affirmative, material misrepresentations to the Receivership Entities and its investors. Among other statements, these included false claims that the Receivership Entities owned ground-breaking technology, and fraudulent representations of the entities' financial positions and projections. Additionally, the Defendants both intentionally concealed that several principals previously faced adverse action from the SEC and private parties for defrauding investors and fraudulently bolstered the resumes of the entities' management.

151. Additionally, the Promotor Defendants had a pecuniary interest in the undisclosed commissions they received for each investment they secured. These commissions were never disclosed to investors, in violation of Section 17(b) of the Securities Act of 1933.

152. The Defendants supplied false information to the Receivership Estate's investors during the course of their business operations. However, the Defendants failed to exercise reasonable care of competence in communicating the false representations.

153. The Receivership Entities and their investors reasonably relied on these fraudulent representations and wired over $40 million in funds to the Insider Defendants.

154. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the Receiver lacked any reasonably feasible means to discover this cause of action until a reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

155. Because of the Defendants' material misrepresentations, the Receivership Estate and its investors have suffered significant financial damages. Pursuant to the Receivership Order, the Receiver is entitled to recover these damages in an amount to be determined at trial.

**COUNT VI**
**Unjust Enrichment**

156. Receiver incorporates each preceding paragraph as if fully stated herein.

157. Based on the Defendants' representations, the Receivership Entities' investors invested over $40 million in the Receivership Entities. As reasonably understood, these funds were intended to finance the Receivership Entities' continued growth in the hopes that they would emerge as profitable enterprises. The Defendants understood that these funds were to serve this purpose.

158. However, instead, the Defendants converted these funds for their own personal benefit and enjoyment, leaving the Receivership Estate with less than $150,000 of the $40 million the Defendants received.

159. Under the circumstances, it would be inequitable to for the Defendants to retain the benefits of these funds without compensating the Receivership Estate.

160. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the

Receiver lacked any reasonably feasible means to discover this cause of action until a reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

161. Accordingly, the Defendants are liable to Receiver, on the Receivership Estate's behalf, for an amount to be determined at trial.

**COUNT VII**
**Conversion**

162. Receiver incorporates each preceding paragraph as if fully stated herein.

163. The Receivership Estates' investors wired funds to the Receivership Entities based on the Defendants' fraudulent representations of those entities' emerging technology, financial condition, leadership, and involved principals. Once the Receivership Estates' investors wired those funds, the Defendants took control of and misappropriated those funds for their own personal benefit.

164. In July and August 2024, through counsel, the Receiver sent nearly all Defendants a letter demanding they return the Receivership Estate's investors' funds. None of the Defendants agreed to do so.

165. In February 2025, again through counsel, the Receiver sent a second letter to nearly all the Defendants, reiterating this demand. Again, all Defendants refused to do so.

166. In March 2025, the Receiver sent her final letter demanding the return of these funds, but again without success.

167. To date, the Receiver only received responses from Defendants Shane Traveller, Tamara Traveller, David Traveller, Robert Shear, Jeremy Neenan, and Timothy Roberts. However, none of these Defendants agreed to return the funds which the

Receivership Estate's bank records evidence they received directly. Similarly, several Defendants sent letters to this Court regarding these demand letters but never contacted the Receiver.

168. The Defendants' conduct constitutes a knowing, willful, and intentional conversion of the Receivership Estates' funds.

169. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the Receiver lacked any feasible means to discover this cause of action until a reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

170. Pursuant to the Receivership Order, the Receiver is entitled to clawback these funds for the Receivership Estate's benefit.

171. Consequently, the Defendants are liable to the Receiver, on behalf of the Receivership Estate, for an amount to be demonstrated at trial.

**COUNT X**
**Breaches of Fiduciary Duties**
**(Against the Insider Defendants)**

172. Receiver incorporates each preceding paragraph as if fully stated herein.

173. Receiver asserts this claim on behalf of the receivership estate and derivatively on behalf of the Receivership Entities.

174. The Insider Defendants as officers and directors of the receivership estate entities owe fiduciary duties to the entities and/or their investors. See TX, WY, SD laws re fiduciary duties; *see also* TBOC §§ 1.101–1.105.

175. Upon information and belief, Defendants breached these duties owed to the receivership estate entities and/or their investors, in whole or in part, by:

a. Engaging in self-dealing that placed their personal interests above those of their respective entities and/or shareholders, including by making unlawful and unauthorized distributions for their personal gain and to the detriment of the respective Receivership Entities and/or their investors;

b. Committing ultra vires acts beyond the scope of authority entrusted to them under the respective entities' articles of incorporation or laws of their respective states;

c. Failing to conduct the affairs of their respective entities with the level of care as an ordinarily prudent person would use under similar circumstances.

176. The doctrine of Adverse Domination tolled any applicable statute of limitations on this cause of action until at least February 8, 2023. However, even then, the Receiver lacked any feasible means to discover this cause of action until a reasonable time after the court approved the Receiver to appoint a forensic accountant, which did not occur until February 1, 2024.

**COUNT VIII**
**Veil Piercing**

177. Receiver incorporates each preceding paragraph as if fully stated herein.

178. Upon information and belief: Desert Ridge LLC is an alter ego of Defendant Tom Warnes; Oil Rig Consulting is an alter ego of Defendant Bill Abt; Traveller Consulting, Inc. and Traveller and Company, LLC are alter egos of Defendant David Traveller; and GSET is an alter ego of Defendant Mic Fuhrman and Mike Sierakowski.

179. Upon information and belief, Defendant Tom Warnes is the sole beneficial owner of Desert Ridge, LLC; Bill Abt is the sole beneficial owner of Oil Rig Consulting; David Traveller is the sole beneficial owner of Traveller Consulting, Inc. and Traveller and Company, LLC; and Mic Fuhrman and Mike Sierakowski are the sole beneficial owners of GSET.

180. Upon information and belief, Desert Ridge, LLC, Oil Rig Consulting, and GSET have failed to in all regards to comply with corporate formalities.

181. Upon information and belief, Desert Ridge, LLC, Oil Rig Consulting, Traveller and Company CPA, and Traveller Consulting LLC have failed to adopt any corporate resolutions, board meetings minutes, or other documentation in accordance with corporate governance that demonstrate that these entities operated in any other way than as alter egos for their respective Defendants.

182. Upon information and belief, Defendants Tom Warnes, Bill Abt, David Traveller, Mic Fuhrman, and Mike Sierakowski used their respective entities as an instrumentality or conduit for their own personal affairs.

183. Upon information and belief, Defendants Tom Warnes, Bill Abt, David Traveller, Mic Fuhrman, and Mike Sierakowski used their respective entities to knowingly divert and protect wrongfully received distributions of investors' funds that are properly included in the receivership estate. Thus, upon information and belief Defendants Tom Warnes, Bill Abt, David Traveller, Mic Fuhrman, and Mike Sierakowski used their respective entities to further their scheme to defraud investors.

184. Upon information and belief, Defendants Tom Warnes, Bill Abt, David Traveller, Mic Fuhrman, and Mike Sierakowski have abused their entities corporate form, causing inequity, fraud, injustice, and prejudice upon the receivership estate.

185. Based on the foregoing, the corporate veils of Desert Ridge, LLC, Oil Rig Consulting, LLC, Traveller and Company, LLC, Traveller Consulting, and GSET should be pierced so that Defendants Tom Warnes, Bill Abt, David Traveller, Mic Fuhrman, and Mike Sierakowski are personally liable to the receivership estate for their entities' liabilities.

**COUNT IX**
**Constructive Trust**

186. Receiver incorporates each preceding paragraph as if fully stated herein.

187. Upon information and belief, the Defendants hold legal title to funds that properly belong to the receivership estate and which they owe to the receivership estate.

188. Defendants acquired legal title to the funds through their tortious conduct, including by committing fraud in connection with the sale of securities and breaches of their fiduciary duties owed to investors, and other inequitable activities.

189. For the Defendants that owed the receivership estate entities and their investors fiduciary duties, they used their fiduciary relationship with the receivership estate entities and their investors to obtain title to these funds and in a manner more advantageous than they would have otherwise been entitled to receive.

190. Defendants obtained legal title to these funds with knowledge that they properly belonged to the receivership estate entities for the benefit of their investors.

191. Consequently, Receiver requests that this Court impose a construct trust with respect to any funds that the Defendants wrongfully converted or obtained.

## JURY DEMAND

192. Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Receiver prays that, upon due proceedings, judgment be rendered herein in her favor as follows:

193. Awarding to Receiver money damages, including treble damages, against all Defendants, jointly and severally, for all losses, injuries, and damages suffered by Receiver, including but not limited to $40 million, as a result of Defendants' federal and state law violations, including statutory penalties, and prejudgment interest as appropriate;

194. In the alternative, awarding to Receiver for rescission damages against all Defendants, jointly and severally, for all losses, injuries, and damages suffered by Plaintiff as a result of Defendants' federal and state law violations;

195. Regardless of whether money damages or rescission is awarded, awarding to Plaintiff punitive damages against all Defendants, jointly and severally, for all losses, injuries, and damages suffered by Receiver as a result of Defendants' fraudulent otherwise willful, wrongful misconduct in violating federal and state law;

196. To the extent consistent with the other remedies awarded, awarding to Receiver her reasonable attorney's fees and costs of this suit and prejudgment interest as authorized by law and/or equity;

197. Awarding Receiver all other relief to which she may be permitted at law or in equity upon the premises hereof.

Dated September 15, 2025

*/s/ Brian J. Malcom*
**Brian J. Malcom (*pro hac vice*)**

Email: bmalcom@bakerdonelson.com
**Baker, Donelson, Bearman**
**Caldwell & Berkowitz, P.C.**
1901 Sixth Avenue, Suite 2600
Birmingham, AL 35203
Phone: 205-250-8369

&

**Mya L. Green (*pro hac vice*)**
Email: sgreen@bakerdonelson.com
**Baker, Donelson, Bearman**
**Caldwell & Berkowitz, P.C.**
850 Morrison Drive, Ste. 775
Charleston, SC 29403
Phone: 202-508-3460

&

**Daniel J. Ferretti**
Texas Bar No. 24096066
Email: dferretti@bakerdonelson.com
**Baker, Donelson, Bearman**
**Caldwell & Berkowitz, P.C.**
1301 McKinney Street, Suite 3700
Houston, Texas 77010
Phone: 713.650.9700
Fax: 713.650.9701

**Counsel for Ferdose al-Taie, Receiver**